Megan Houdeshel (12429)
Michael Drysdale (MN Bar 0257606) (*pro hac vice application forthcoming*)
Jensen Lillquist (18994)
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone:  (801) 933-7360
Facsimile:  (801) 933-7373
houdeshel.megan@dorsey.com
drysdale.michael@dorsey.com
lillquist.jensen@dorsey.com

Mark E. Kittrell (9950)
Amanda A. Berndt (15370)
**SALT LAKE CITY CORPORATION**
451 South State Street, Suite 505A
P.O. Box 145478
Salt Lake City, Utah 84114-5478
(801) 535-7788
Mark.Kittrell@slc.gov
Amanda.Berndt@slc.gov

*Attorneys for Salt Lake City Corporation*

Perrin R. Love (5505)
William G. Garbina (13960)
Sharadee Fleming (9872)
**SALT LAKE COUNTY
DISTRICT ATTORNEY**
35 East 500 South
Salt Lake City, UT 84111
(385) 468-7700
PELove@saltlakecounty.gov
WGarbina@saltlakecounty.gov
SFleming@saltlakecounty.gov

*Attorneys for Salt Lake County*

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SALT LAKE CITY CORPORATION, a Municipal Corporation, and<br><br>SALT LAKE COUNTY, a political subdivision of the State of Utah,<br><br>     Plaintiffs,<br><br>vs.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security,<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil No. 2:26-cv-528<br><br>Judge |

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, and

DAVID VENTURELLA, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement,

          Defendants.

## INTRODUCTION

1.      Salt Lake City Corporation ("the City"), a Utah municipal corporation, and Salt Lake County ("the County"), a political subdivision of the State of Utah, bring this action seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Intergovernmental Cooperation Act ("ICA"), 31 U.S.C. §§ 6501 *et seq.*, to halt Defendants' unlawful decision to convert a warehouse into a giant immigration detention facility in Salt Lake County, Utah.

2.      On February 13, 2026, Defendant United States Immigration and Customs Enforcement ("ICE") announced a nationwide $38.3 billion "Detention Reengineering Initiative" ("DRI"), under which ICE would radically transform immigration detention facilities and practices throughout the United States. A central component of the DRI is the "acquisition and processing of eight "Large Scale Detention Centers" also self-described as "Mega Centers." Each Mega Center is intended to house 7,000 to 10,000 detainees, "as the primary locations for international removals." ICE's stated intent is to "activate all facilities by November 30, 2026."

2

3.      In furtherance of the DRI, on or around March 11, 2026, Defendant U.S. Department of Homeland Security ("DHS") purchased an 833,000 square-foot warehouse located on 45 acres of land at 6020 West 300 South, Salt Lake City, Utah, for $145.4 million (the "Salt Lake Warehouse"). ICE has publicly stated plans to convert the Salt Lake Warehouse, as with others around the country, into a detention facility to house anywhere from 7,500 to 10,000 detainees. The Salt Lake Warehouse, once transformed into a mega center ("Salt Lake Mega Center"), is intended to serve as a hub for international removals, and to receive and house immigrants detained throughout the Intermountain West.

4.      Converting the Salt Lake Warehouse into the Salt Lake Mega Center, and operating the Salt Lake Mega Center, will have drastic environmental, economic, and public health and safety impacts for the City, the County, and the State of Utah as a whole.

5.      Utah is currently in a mega drought and regularly experiences drought conditions. Salt Lake City's drought and water planning includes carefully managing water demand and limiting uses that consume large quantities of water.

6.      Under previous ownership, the Salt Lake Warehouse used an estimated 5,600 gallons of water per day, indoors and outdoors, which is typical water demand for a warehouse. In contrast, the Salt Lake Mega Center, at full build-out, would use one to two million gallons of water per day on average to serve the daily water consumption needs of up to 13,000 people. Peak demand water consumption could be much higher.

7.      The Salt Lake Mega Center will also further strain the Salt Lake City sewage collection system which is already at capacity. It is estimated that sewage flows from the Salt Lake Mega Center would be one to two million gallons per day on average with peak demands

up to four million gallons per day, which is roughly twice the amount already generated at the nearby Utah State Prison. Such an influx would require expanded sewer lines, upsized sewer lift stations and pump stations, and likely additional trunk lines to manage such flows.

8.      Local roads will experience heavy wear and tear from the influx of users, including transport vehicles for loved ones and legal counsel exercising their rights to visit detained noncitizens.

9.      An increase in traffic, along with increased air emissions from pollution-emitting equipment, will likely worsen the already poor air quality in the City and the County.

10.      An influx of people working on, congregating at, traveling to and from the Salt Lake Mega Center will likely also exacerbate the measles crisis in Utah.

11.      The Salt Lake Mega Center is highly controversial and has already elicited protests, which have been requiring and will likely continue to require local law enforcement presence to ensure public safety.

12.      Defendants did not consult with the City or the County to address any of these concerns. Nor has either the City or the County been made aware that Defendants made any attempt to evaluate these concerns in deciding to purchase and repurpose the Salt Lake Warehouse.

13.      This is part of a pattern. Defendants have rushed to purchase and convert several warehouses across the country as part of the DRI.

14.      In applying the model to Salt Lake City, Defendants have violated federal law, ignored the City's and the County's interests, and, unless enjoined, will cause substantial harm to the City and the County. The APA, NEPA, and the ICA function as safeguards to ensure federal

4

agencies act transparently, conduct reasoned decision-making, evaluate the environmental impacts of proposed actions, and analyze feasible alternatives. Specifically, the APA requires federal agencies to engage in reasoned decision-making and follow applicable law. And NEPA mandates federal agencies to engage in environmental analysis and prepare detailed statements analyzing impacts before taking final action. This review process ensures environmental effects are properly considered and interested parties, such as states, local government, and members of the public, have access to relevant, accurate information.

15.     In their haste, Defendants failed to conduct a public NEPA review (if any NEPA review was done at all) prior to purchasing the Salt Lake Warehouse. Defendants' rushed actions also led to an abandonment of any reasoned decision-making as contemplated by the APA.

16.     Defendants have also publicly stated that they intend to imminently issue contracts for the reconfiguration of the Salt Lake Warehouse into the Salt Lake Mega Center. To make matters worse, Defendants have provided little information to the City and the County concerning its plans for the Salt Lake Warehouse, let alone cooperated with the City or the County as contemplated by NEPA and required by the ICA. The lack of collaboration and communication is particularly concerning given the Salt Lake Mega Center will have significant immediate and long-term effects on the City, the County, and their residents.

17.     Defendants' actions violate the APA, NEPA, and the ICA. This court should vacate and set aside Defendants' purchase of the Salt Lake Warehouse for the purpose of converting it into the Salt Lake Mega Center and should enjoin any further implementation of the decision to convert it, including but not limited to any further activity related to construction or retrofitting, until such time as the Defendants comply with applicable law.

5

**JURISDICTION AND VENUE**

18.    Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

19.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiffs Salt Lake City Corporation and Salt Lake County are located in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

**PARTIES**

**I.    PLAINTIFFS**

20.    Plaintiff Salt Lake City Corporation is a municipal corporation organized under the laws of the State of Utah.

21.    Plaintiff Salt Lake County is a political subdivision of the State of Utah.

**II.    DEFENDANTS**

22.    Markwayne Mullin is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. He is sued in his official capacity, and his office is located at 2707 Martin Luther King Jr. Ave. SE, Washington, D.C. 20528.

23.    The U.S. Department of Homeland Security is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), and is located at 2707 Martin Luther King Jr. Ave. SE, Washington, D.C. 20528.

24.    ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is under the supervision of DHS and is located at 500 12th St. SW, Washington, D.C. 20536.

6

25.     David Venturella is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity, and his office is located at 500 12th St. SW, Washington, D.C. 20536.

## BACKGROUND

### I.      LEGAL BACKGROUND

#### A.      Federal Agencies Must Engage in Reasoned Decision-making.

26.     "The APA 'sets forth the procedures by which federal agencies are accountable to the public'" and in doing so, "requires agencies to engage in 'reasoned decision making.'"[1] An agency makes reasoned decisions where it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[2] An agency fails to engage in reasoned decision-making if it (1) "relie[s] on factors Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the problem"; or (3) "offer[s] an explanation for its decision that runs counter to the evidence before" it "or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[3]

27.     When an agency changes its policy or position on an issue, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display

---

[1] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citations omitted).

[2] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also id.* at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner.").

[3] *Id.*

awareness that it *is* changing its position."[4] An agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[5] And if an agency chooses to change its policy or position, it "must show that there are good reasons" for doing so.[6]

28.    Agencies that fail to engage in reasoned decision-making will have their actions "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[7]

> **B.    NEPA Mandates Federal Agencies to Consider the Environmental Impacts of Major Federal Actions.**

29.    NEPA establishes a national environmental policy promoting "efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."[8] Congress recognized "the profound impact of man's activity on the interrelations of all components of the natural environment" and declared it "the continuing policy of the Federal Government, *in cooperation with State and local governments*, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals.[9]

30.    "NEPA has twin aims."[10] It both "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "ensures

---

[4] *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

[5] *Id.*

[6] *Id.*

[7] 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of Cal.*, 591 U.S. at 16.

[8] 42 U.S.C. § 4321.

[9] *Id.* § 4431(a) (emphasis added).

[10] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).

that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[11] The purpose of NEPA "is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'"[12]

31.     The NEPA process is triggered whenever agencies (1) contemplate "major Federal actions," (2) "significantly affecting," (3) "the quality of the human environment."[13] Whether an action is a "major federal action" turns on an agency's determination of whether the action "is subject to substantial Federal control and responsibility."[14]

32.     NEPA applies to DHS actions, and it "is DHS policy to comply with NEPA."[15] In line with its policy, DHS guidance documents state that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS" or "executed by DHS under the direction of Congress."[16] By

---

[11] *Id.* (citation omitted); *see also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002) (acknowledging same).

[12] *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 197–98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

[13] 42 U.S.C. § 4332(2)(C).

[14] *Id.* § 4336e(10)(A).

[15] Dep't of Homeland Sec., *Directive 023-01, Revision 01, Implementation of the National Environmental Policy Act,* § V(A) (Oct. 31, 2014), https://www.dhs.gov/sites/default/files/publications/mgmt/environmental-management/mgmt-dir_023-01-implementation-national-environmental-policy-act_revision-01.pdf.

[16] Dep't of Homeland Sec., *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, at III-1 (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf (hereinafter "DHS Instruction Manual").

DHS's own policies, the purchase of the Salt Lake Warehouse for conversion to the Salt Lake Mega Center certainly qualifies as a major federal action subject to NEPA.

33.     Although all major federal actions are subject to NEPA, certain types of activities may be categorically excluded by agency regulation from preparation of detailed NEPA documents.[17] A "categorical exclusion" is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment."[18] Per DHS's internal guidance, a categorical exclusion is only appropriate for actions which "[c]learly fit[] the category described," are "not a piece of a larger action," and for which "[n]o extraordinary circumstances exist."[19] A proposed action must "clearly meet all three conditions" to be categorically excluded.[20]

34.     If the agency concludes NEPA applies and there is no applicable categorical exclusion, it must then consider whether the action "has a reasonably foreseeable significant effect on the quality of the human environment."[21] If yes, the agency will complete an environmental impact statement ("EIS").[22] In completing an EIS, agencies must explain (1) "reasonably foreseeable environmental effects of the proposed agency action," (2) any unavoidable "reasonably foreseeable adverse environmental effects" if the proposal is implemented, (3) alternatives to the proposed agency action, including a no-action alternative,

---

[17] 42 U.S.C. § 4336(a).

[18] *Id.* § 4336e(1).

[19] DHS Instruction Manual at V-5.

[20] *Id.* at V-4 to V-5.

[21] 42 U.S.C. § 4436(b).

[22] *Id.* § 4436(b)(1).

10

(4) "the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of Federal resources" involved if the agency action is implemented.[23]

35.    An agency must consider *all* reasonable alternatives to its proposed action.[24] The APA's reasoned decision-making requirement "applies both to which alternatives the agency discusses and the extent to which it discusses them."[25]

36.    If the agency determines the action "does not have a reasonably foreseeable significant effect on the quality of the human environment," the agency will conduct an environmental assessment ("EA").[26] An EA is generally less detailed than an EIS and may result in either a finding that an action will result in "no significant impact" on the human environment" or that an EIS is necessary.[27] If the EA determines that the project may have a significant impact, then an EIS must be prepared.

37.    According to DHS guidance documents, DHS considers a broad range of effects when evaluating proposed actions, including "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."[28]

---

[23] *Id.* § 4332(2)(C).

[24] *Utahns v. United States DOT*, 305 F.3d 1152, 1166 (10th Cir. 2002).

[25] *Id.*

[26] 42 U.S.C. § 4436(b)(2).

[27] *Id.*

[28] DHS Instruction Manual at II-2.

C.     **The ICA Contemplates that Federal Agencies Consider Regional and Local Viewpoints.**

38.     The ICA was originally passed to "achieve the fullest cooperation and coordination of activities among the levels of government in order to improve the operation of our federal system in an increasingly complex society."[29]

39.     The ICA requires that "[t]o the extent possible, all national, regional, State, and *local* viewpoints shall be considered in planning development programs and projects of the United States Government."[30] Further, "[a]vailable projections of future conditions in the United States and needs of regions, States, and localities shall be considered in plan formulation, evaluation, and review."[31]

40.     The ICA also mandates that the President "prescribe regulations governing the formulation, evaluation, and review of United States Government programs and projects having a significant impact on area and community development."[32] These regulations "shall provide for the consideration of concurrently achieving the following specific objectives," including "wise development and conservation of all natural resources" and "properly planned community facilities (including utilities for supplying power, water, and communications) for safely disposing of wastes, and for other purposes."[33]

---

[29] Pub. L. No. 90-577, 82 Stat. 1098 (1968).

[30] 31 U.S.C. § 6506(c) (emphasis added).

[31] *Id.*

[32] *Id.* § 6506(b).

[33] *Id.*

12

41.      Executive Order 12372 delegated the power to promulgate regulations to "[f]ederal agencies" to "provide opportunities for consultation by elected officials of those State and local governments . . . that would be directly affected by . . . direct Federal development."[34]

42.      DHS does not appear to have promulgated regulations implementing Executive Order 12372. However, in the NEPA context, DHS internal documents emphasize the importances of "[i]ntergovernmental collaboration and public involvement."[35]

43.      And as with NEPA, the ICA imposes "an affirmative obligation" on an agency "to develop a reviewable record . . . so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously."[36] If an agency decides "to act in disharmony with local planning objectives," it must include in its record "a list of the factors which support its decision."[37]

## II.    FACTUAL BACKGROUND

### A.    ICE Adopts Policy to Expand Its Use of Large-scale Detention Facilities Nationwide.

44.      Historically, ICE has prioritized arresting and detaining "individuals deemed most likely to be public safety threats or fugitives—primarily those with criminal records or prior

---

[34] Exec. Order No. 12372, § 1, 47. Fed. Reg. 30,959 (July 14, 1982).

[35] DHS Instruction Manual at IV-6.

[36] *Rochester v. United States Postal Serv.*, 541 F.2d 967, 976 (2d Cir. 1976).

[37] *Id.*

orders of removal."[38] However, since President Trump took office, arrests and subsequent detentions have increased nationwide.[39]

45.     DHS's announced policy in the DRI is to expand the country's immigrant detention system, which is already the largest in the world.[40] The Administration seeks to "speed up deportations by establishing a deliberate feeder system."[41] ICE has stated it plans to have the system operational by November 30, 2026.[42]

46.     Former ICE Director Todd Lyons publicly stated the federal government "need[s] to get better at treating [deportations] like a business" and that he wanted the process to run "like (Amazon) Prime, but with human beings."[43]

47.     ICE's plans to expand detention facilities come on the heels of the Congress's passage of the One Big Beautiful Bill Act, which provided ICE with $45 billion in funding until 2029 for detention centers.[44] This funding was on top of the almost $10 billion already

---

[38] Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term,* at 10 (Jan. 2026), https://www.americanimmigrationcouncil.org/wp-content/uploads/2026/01/immigration-detention-report.pdf.

[39] *Id.*

[40] Douglas MacMillan & Jonathan O'Connell, *ICE documents reveal plan to hold 80,000 immigrants in warehouses*, Wash. Post (Dec. 24, 2025), https://www.washingtonpost.com/business/2025/12/24/ice-immigrants-detention-warehouses-deportation-trump/.

[41] *Id.*

[42] U.S. Immigr. & Customs Enf't, ICE Detention Reengineering Initiative at 3 (Feb 13, 2026), copy attached as Exhibit A.

[43] Jerod MacDonald-Evoy, *ICE director envisions Amazon-like mass deportation system: 'Prime, but with human beings'*, AZ Mirror (Apr. 8, 2025), https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-mass-deportation-system-prime-but-with-human-beings/.

[44] Pub. L. No. 119-21, § 90003, 139 Stat. 72, 358 (2025).

appropriated for ICE for the 2025 fiscal year.[45] Nothing in either appropriation excuses ICE from complying with the APA, NEPA, the ICA, or any other legal requirement.

48.    ICE announced the DRI on February 13, 2026.[46] The DRI discusses the expansion of detention centers nationwide, including acquiring and renovating mega centers.[47] It also directly addresses concerns about these facilities "overwhelm[ing] city utilities, resources, and existing infrastructure."[48] ICE assures it "conducted a thorough due diligence process prior to purchasing each facility" which included "thorough site inspections"; "analysis of utility services"; "testing and inspection of mechanical and electrical systems"; "zoning reports"; "site fit testing"; and review of "power supply systems, water supply infrastructure and wastewater exportation."[49] ICE also explicitly states, "NEPA surveys were also conducted for each site."[50]

49.    Though ICE purchased the Salt Lake Warehouse after the publication of the DRI, there is no public record of any meaningful NEPA process. According to DHS's website, there are no EISs or EAs related to the proposed Salt Lake Mega Center available for public review and comment.

50.    No other due diligence process has occurred, at least not one either the City or the County was privy to. And the City and County, along with their residents, will feel the brunt of the effects of such a facility, given the City would be responsible for the Salt Lake Mega

---

[45] Pub. L. No. 119-4, § 1701, 139 Stat. 9 (2025).
[46] Exhibit A.
[47] *Id.* at 1.
[48] *Id.* at 3.
[49] *Id.*
[50] *Id.*

Center's water and wastewater needs, and the County is principally responsible for safeguarding public health and law enforcement. Both Plaintiffs also own and maintain specific components of the network of public roads and other public infrastructure the Salt Lake Mega Center will use and strain.

51.    It also appears the State of Utah was left in the dark as well. According to Utah Governor Spencer Cox, the state was not "given any notice . . . . No members of our congressional delegation were given any notice. No locals were given any notice."[51]

52.    It does not appear unique for ICE to avoid its own internal processes when it comes to acquiring detention centers. A 2021 report from the U.S. Government Accountability Office concluded ICE "needs to improve its detention space acquisition planning and oversight to more effectively use federal funds."[52] The report further concluded "ICE has not consistently followed its process for obtaining detention space" and recommended ICE "[c]onsistently us[e] a process that includes gathering input from relevant stakeholders and documenting the basis for decisions made before entering into contracts for new or expanded detention space."[53]

53.    Indeed, experience in other jurisdictions with other proposed Mega Centers indicates that ICE has likely flouted NEPA. In Maryland, for example, ICE attempted to invoke three different categorical exclusions to justify not preparing an EA or EIS for a similar

---

[51] Brigham Tomco, *Utah governor backs ICE mega-detention center but raises transparency concerns*, Deseret News (Mar. 19, 2026), https://www.deseret.com/politics/2026/03/19/utah-governor-supports-new-ice-detention-center-in-salt-lake-city-amid-local-protests/.

[52] U.S. Gov't Accountability Off., Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts 43 (Jan. 13, 2021), https://www.gao.gov/assets/gao-21-149.pdf.

[53] *Id.*

warehouse conversion.[54] And according to documents disclosed only in litigation, ICE has attempted to invoke the same three categorical exclusions for warehouses it purchased in both New Jersey and Michigan.[55]

54.     These categorical exclusions include (1) "Acquisition of an interest in real property . . . which does not result in a change in the functional use of the property"; (2) "Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the property"; and (3) "New construction upon or improvement of land where . . . [t]he proposed use will not substantially increase the number of motor vehicles at the facility or in the area, . . . [t]he site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and . . . [t]he construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.)."[56]

55.     The district court in Maryland preliminarily enjoined further development of that conversion. In doing so, the court characterized ICE's application of NEPA as "absurd."[57]

56.     If invoked, the application of these exclusions to the Salt Lake Mega Center would be similarly absurd.

---

[54] *Maryland v. Mullin, et al.*, No. 1:26-cv-00733-BAH, 2026 WL 1045503, at *9 (D. Md. Apr. 17, 2026) (order granting preliminary injunction); .

[55] *See* Opp'n to Mot. for Prelim. Inj., Ex. B (ECF 19-2), *Michigan v. Dep't of Homeland Sec.*, No. 2:26-cv-10968 (E.D. Mich. Apr. 24, 2026; Byers Decl., Ex. 1 (ECF 26-3), *New Jersey v. U.S. Immigr. and Customs Enf't*, No. 2:26-cv-2884 (D.N.J. Apr. 23, 2026).

[56] *Maryland*, 2026 WL 1045503, at *9.

[57] *Id.*

57.     Given that EAs and EISs require public notification, the conclusion is inescapable that ICE either has invoked the same or similar categorical exclusions to address NEPA as it did in Maryland, or it has ignored NEPA's requirements altogether.

**B.     ICE Purchases the Salt Lake Warehouse to Serve as One of Several Mega Centers Across the Country Intended to Detain Noncitizens.**

58.     On information and belief, Suburban Land Reserve sold two parcels of land in January 2019 and October 2020, respectively, to a Utah-based developer.[58] The combined acreage is approximately 45 acres. The developer constructed the Salt Lake Warehouse on the parcels and then sold it to RREEF CPIF 6020 W 300 S, LLC ("RREEF") in 2022.[59]

59.     The Salt Lake Warehouse, located at 6020 West 300 South, is approximately 833,000 square feet.[60]

60.     RREEF "made regular improvements to the building, including adding offices" and renovating "plumbing, mechanical and electrical systems" over the course of its four-year ownership.[61]

61.     As recently as February 4, 2026, RREEF applied for City permits "to upgrade power systems to the building and change the layout of some of its utility rooms."[62]

---

[58] Jose Davila IV & Tony Semerad, *Here's who sold the Salt Lake City warehouse to ICE, and how we traced its ownership*, MSN (Mar. 14, 2026), https://www.msn.com/en-us/money/real-estate/here-s-who-sold-the-salt-lake-city-warehouse-to-ice-and-how-we-traced-its-ownership/ar-AA1YCqJa?ocid=BingNewsVerp.

[59] *Id.*; Jacob Scholl, *ICE bought Salt Lake City warehouse at 'unheard of price'*, Building Salt Lake (Mar. 18, 2026), https://buildingsaltlake.com/ice-bought-salt-lake-city-warehouse-at-unheard-of-price/.

[60] Garna Mejia, *Questions grow over possible ICE 'Mega Center' in Salt Lake City*, KSL (Mar. 20, 2026), https://ksltv.com/local-news/ice-megacenter-salt-lake-city/890226/.

[61] Davila IV & Semerad, *supra* note 58.

[62] *Id.*

18

62.     On or around March 11, 2026, DHS purchased the property for $145.4 million.[63]

63.     On March 17, 2026, City Mayor Erin Mendenhall sent a letter to ICE officials requesting a meeting about the purchase and expressing concern that the Salt Lake Mega Center would create numerous problems for the City, including zoning, infrastructure, economic development, and public safety concerns.

64.     The following week, Mayor Mendenhall met virtually with ICE officials.[64] ICE officials informed the Mayor they were "waiting for a due diligence report" on the land and would share the information with City officials.[65] To date, ICE has shared no such report with the City.

65.     Further, ICE officials told Mayor Mendenhall they planned to consult with the City fire marshal but ICE has not done so.

66.     ICE officials told Mayor Mendenhall that they might truck water and sewage from the Salt Lake Mega Center as an "interim solution" to the facility's water and sewer needs. Trucking fluids at these volumes would create a constant and significant strain on City roads, and it is entirely unclear where such water would come from if not from the City or go to if not to the City's wastewater treatment plant.

67.     A similar pattern played out with the County. On April 3, 2026, County Mayor Jenny Wilson sent a letter to Secretary Mullin articulating the County's concerns, which were

---

[63] *Id.*; Annie Knox, *Seeking answers, Salt Lake City hears crickets from feds on planned ICE warehouse*, Utah News Dispatch (Apr. 24, 2026), https://utahnewsdispatch.com/2026/04/24/salt-lake-city-seeking-answers-on-planned-ice-warehouse/.

[64] *Id.*

[65] *Id.*

consistent with those of the City. In particular, the County noted the enormous scale of the Salt Lake Mega Center, exceeding the usual detained-persons population of the *combined* County and State correctional systems.

68.     Mayor Wilson and staff had a virtual call with Deputy DHS Secretary Troy Edgar and Chief of Staff Clark Barrow on April 10, 2026. During the call, DHS shared similar messages to the County as they had to the City, as well as a similar lack of concrete details.

69.     In a letter dated April 22, 2026, which was received by the City on April 29, 2026, then-Director Todd Lyons responded to Mayor Mendenhall's March 17, 2026, letter.[66] Director Lyons confirmed ICE's implementation of the DRI. Director Lyons further confirmed the purchase of the Salt Lake Warehouse, and that the Salt Lake Warehouse is "projected to serve as a large scale detention center for the region and surrounding states."[67] Although the letter states that ICE will engage with state and local officials "regarding site specific plans,"[68] there is no indication in the letter that ICE will comply with local laws, that ICE is planning to conduct further (or any) NEPA analysis for the Salt Lake Mega Center, or that ICE is relaxing its commitment in the DRI to have the Salt Lake Mega Center fully "activated" by November 30, 2026.

70.     The County did not receive any written response or further follow-up to Mayor Wilson's letter.

---

[66] Exhibit B.

[67] *Id.* at 1–2.

[68] *Id.* at 1.

20

71.     The plan articulated in the letter to Mayor Mendenhall appears to be proceeding. On May 13, 2026, ICE sent a letter to the City initiating consultation under the National Historic Preservation Act ("NHPA"). The letter described planned improvements consistent with the DRI model:

> As part of the undertaking, ICE may conduct exterior and interior modifications to the existing buildings. Exterior upgrades may include, but are not limited to, painting or sealing the exterior of the structure; installing, removing, or modifying bays (truck bays, window bays, or doors); repairing or replacing the existing roof or cladding materials; adding security equipment; or adding exterior personnel/guest access controls. The interior of the structure may be renovated or rebuilt to support ICE operational requirements, which may include but are not limited to construction of holding and processing spaces, office space, public-facing visitor spaces, and installation of amenities, such as cafeterias, bathrooms, and health care spaces.

The letter did not provide any further details, a timetable, or indicate any intent to conduct a NEPA analysis.

72.     To date, the County has not received an NHPA consultation letter concerning the Salt Lake Warehouse.

73.     The City requested further information from ICE on May 18, 2026. The City specifically requested information from ICE on its plans for complying with NEPA. Given the speed at which ICE appeared to be moving, the City requested a response within seven days. As of this filing, ICE has not responded to the City's May 18, 2026 letter.

74.     Instead, on May 29, 2026, the City received from ICE an incomplete Application for Utility Services, requesting water and sewer service. The application did not provide any information on anticipated water and sewer needs, labeling all details as "TBD."

21

75.     Collectively, these activities and communications indicate an accelerating process of moving forward with the Salt Lake Mega Center, with minimal consultation with the City and County, and no indication of any NEPA process.

**C.     A Mega Center in the City Would Cripple Already Limited Resources and Negatively Impact Public Health.**

76.     The potential of a Salt Lake Mega Center raises numerous concerns relating to water, sewage, traffic, air quality, and public health and safety, none of which appear to have been critically evaluated by ICE in its rush to expand detention capacity.

77.     **Water.** 100 percent of Salt Lake County is in severe drought.[69] And 100 percent of the entire state is in varying forms of drought, ranging from moderate to exceptional, with the majority of the state in extreme drought.[70]

78.     On May 21, 2026, Governor Spencer Cox declared a state of emergency due to the severe drought conditions.[71]

---

[69] *Drought Conditions for Salt Lake County*, Nat'l Integrated Drought Info. Sys., https://www.drought.gov/states/utah/county/Salt%20Lake (last visited June 2, 2026).

[70] *Utah*, Nat'l Integrated Drought Info. Sys., https://www.drought.gov/states/utah (last visited June 2, 2026).

[71] Exec. Order 2026-02, *Declaring a State of Emergency in the State of Utah Due to Drought Conditions* (May 21, 2026), https://governor.utah.gov/wp-content/uploads/2026.05.20-EO-Drought-Declaration-1.pdf.

79. As of May 1, 2026, "[a]ll of the state's major basins were below 40% of normal" snow water equivalent,[72] "most were below 20%, and several had already completed dried out" at the monitoring sites.[73] Ninety-five percent of water supply in Utah comes from snowpack.[74]

80. Lake effect snow stemming from the Great Salt Lake contributes to Utah's snowpack, which is critical to water supplies and feeds the multi-billion-dollar ski industry here in Utah.[75]

81. As of June 7, 2026, the Great Salt Lake is only 35.4 percent full, and 53.9 percent of the lakebed is exposed.[76]

82. Under previous ownership, the Salt Lake Warehouse used approximately 5,600 gallons a day, indoors and outdoors, which is typical water demand for a warehouse.

83. A 7,500-person mega center is likely to use one to two million gallons of water per day, and peak demand could be higher. A 10,000-person facility would use even more.

84. The water use contemplated by the Salt Lake Mega Center would cause a massive and unsustainable strain on such limited water sources. Because ICE would draw the detainee

---

[72] Snow water equivalent "is the amount of water contained in snow." *What is SWE and Why Should You Care*, Utah Div. of Water Res. (Dec. 18, 2024), https://water.utah.gov/what-is-swe-and-why-should-you-care/ (last visited June 8, 2026).

[73] *Utah Water Supply Outlook Report*, Nat'l Res. Conserv. Serv. 2 (May 1, 2026), https://www.nrcs.usda.gov/sites/default/files/2026-05/WSOR_May_2026.pdf.

[74] *Utah is one of the driest states in the nation*, Utah Dep't of Nat. Resources (June 8, 2026), https://drought.utah.gov/.

[75] *Protecting and Preserving the Great Salt Lake*, The Great Salt Lake, https://greatsaltlake.utah.gov/ (last visited June 8, 2026).

[76] *Great Salt Lake Tracker*, Grow the Flow, https://growtheflowutah.org/laketracker/ (last visited June 8, 2026).

population from multiple states, most of the water use would constitute a net increase in demand on the Salt Lake City Department of Utilities ("SLCDPU") water-service system.

85.    The County has a critical interest along with the City in maintaining adequate water supply among competing demands. Approximately one-third of the connections to the SLCDPU water-service system are located outside the City's boundaries, but within the County's boundaries.

86.    **Sewage.** The Salt Lake Warehouse and surrounding area lack the necessary utility infrastructure to meet the demands of a mega detention center. It is anticipated that over a million gallons a day of sewer effluent will need to be transported away from the Salt Lake Mega Center. A demand of this size would put strain on the City's wastewater system and require substantial infrastructure upgrades as the area's system is already near capacity.

87.    **Traffic.** Defendants have provided no details on expected traffic impacts. As a result, the City and County do not know whether local roads can accommodate the significant increase in traffic resulting from ICE's need to move noncitizens to and from the Salt Lake Mega Center. Traffic in the area will likely also increase due to employees of the mega center commuting to work and friends, family, and legal counsel exercising their rights to visit detainees. Further, Defendants have not informed the City or County about whether they anticipate having to close roads in the area to accommodate traffic to and from the Salt Lake Mega Center or whether there will be any other acute traffic impacts in the area. And while the City owns and maintains the roads in the immediate vicinity of the Salt Lake Warehouse property, the County owns and maintains critical feeder roads to the area.

24

88.     **Air quality.** The City and County "face[] significant air quality challenges in both the summer and winter."[77] During the winter, inversion[78] causes particulate pollution "to double every day."[79] In the summer, "pollution from cars, industry, and a multitude of chemical products, combined with high temperatures and bright sunshine, lead to harmful ozone levels."[80]

89.     Any impacts to air quality from operation of the proposed Salt Lake Mega Center must be identified, analyzed, and mitigated through the public NEPA process and consultation with State and local officials. For example, emissions at the Salt Lake Mega Center may increase if its operation requires installing an industrial boiler or other pollution-emitting equipment. Further, the anticipated increased traffic could adversely impact emissions and air quality.

90.     **Public health.** As of April 2025, almost half of all ICE detention facilities "were operating above their contractual capacities.[81] This overcrowding has led to the spread of illness and disease, broken hygiene infrastructure, inoperable plumbing, delay in prescriptions, and denial of medical treatment.[82]

---

[77] *Air Quality*, Salt Lake City Sustainability, https://www.slc.gov/sustainability/air-quality/ (last visited June 8, 2026).

[78] "Inversion" refers to "periodic temperature inversions which trap cold air underneath a layer of warm air," acting "like a lid." *Id.*

[79] *Id.*

[80] *Id.*

[81] Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term*, at 36 (Jan. 2026), https://www.americanimmigrationcouncil.org/wp-content/uploads/2026/01/immigration-detention-report.pdf.

[82] *Id.* at 36–37.

91.     On information and belief, these public health concerns have led to death in some cases.[83] As of March 18, 2026, 46 people had died in ICE detention centers since January 2025.[84]

92.     Utah is currently experiencing a measles crisis. As of June 2, 2026, there are 675 confirmed active cases in the state.[85] Indeed, Utah has reportedly "become the latest epicenter for measles transmission" in the United States.[86]

93.     Clustering up to 10,000 people in the Salt Lake Mega Center is likely to cause a surge in infections, with the Salt Lake Mega Center acting as "ground zero" for even more infections across the state. This is of critical interest to the County, which is the lead local agency for monitoring and protecting public health.

94.     **Public Safety.** The Salt Lake Mega Center is highly controversial. It has already stirred public protest and is likely to elicit more.[87] Local law enforcement presence would likely be required to respond to any future protest, which will significantly strain the City and County's

---

[83] *Id.*

[84] Akash Pillai, Drishti Pillai, and Samatha Artiga, *Deaths and Health Care Issues in ICE Detention Centers Under the Second Trump Administration* (Mar. 25, 2026), https://www.kff.org/racial-equity-and-health-policy/deaths-and-health-care-issues-in-ice-detention-centers-under-the-second-trump-administration/.

[85] *Utah Measles Dashboard*, Utah Dep't of Health & Hum. Servs. (June 2, 2026), https://files.epi.utah.gov/Utah%20measles%20dashboard.html.

[86] Joseph Choi, *Utah becomes center of latest measles outbreak in U.S.*, The Hill (May 7, 2026), https://thehill.com/policy/healthcare/5867072-utah-measles-outbreak-2026/.

[87] *See, e.g.*, Annie Knox, *Hundreds demand 'ICE out' of Salt Lake warehouse set to become detention center*, Utah News Dispatch (Mar. 19, 2026), https://utahnewsdispatch.com/2026/03/19/protest-ice-out-of-salt-lake-warehouse-set-to-become-detention-center/.

law enforcement resources and will take away capacity to respond to other needs within the City and County.

95.    Any investigations arising from the operation of the Salt Lake Mega Center may also strain the City and County's prosecutorial teams and the state court system, which are already overburdened. For example, the County's District Attorney's Office screens over 23,000 cases annually and its prosecutors are often handling over 400 general felony cases at any given time. The City is generally responsible for prosecuting misdemeanor offenses in the City boundaries, while the County prosecutes felony offenses occurring in both the City and the County.

96.    **Other Services and Activities.** The Salt Lake Mega Center will create all the other demands a population of 7,500 to 10,000 prisoners and 3,000 employees would entail. For example, the local detention center in Minneapolis has a capacity of approximately 100 detainees. In the three months between December 2025 and February 2026, ICE Operation Metro Surge generated over 1,000 habeas petitions to the District of Minnesota, and significant disruption of a wide array of economic activity and social services. The Salt Lake Mega Center is two orders of magnitude greater in scale, and even if the impacts are not fully linear, the impacts would be vast and wide-ranging.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**Violation of the Administrative Procedure Act**
**Action that is Contrary to Law and/or Arbitrary and Capricious**
**(NEPA, 42 U.S.C. §§ 4321, *et seq.*)**

27

97.     The City and County reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

98.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, or not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

99.     Under the APA, courts are required to "hold unlawful and set aside" agency actions that are "arbitrary . . . [and] capricious." 5 U.S.C. § 706(2).

100.    Defendants' decision to purchase the Salt Lake Warehouse for purposes of converting it into the Salt Lake Mega Center constitutes final agency action reviewable under the APA.

101.    NEPA claims are subject to judicial review under the APA.

102.    Defendants' decision to purchase the Salt Lake Warehouse for the purposes of converting it into a mega detention center is a "major Federal action[]" with significant impacts on the human environment that must be evaluated under NEPA. 42 U.S.C. § 4332(2)(C). This "major Federal action[]" is under ICE's substantial direction and control. 42 U.S.C. § 4336e(10)(A).

103.    Defendants were required to prepare an EA or EIS prior to purchasing the Salt Lake Warehouse for the purpose of converting it into the Salt Lake Mega Center.

104.    Failure to conduct NEPA's required environmental review deprives the State of Utah, local governments, and the public of the procedure they are entitled to by law.

105. The failure to prepare an EA or EIS when required is also arbitrary and capricious.

106. An agency acts arbitrarily and capriciously where it invokes inapplicable categorical exclusions. Where an agency offers inadequate or clearly erroneous reasoning to support a categorical exclusion, a court may properly vacate the agency's action until it complies with NEPA.

107. To the City's and County's knowledge, Defendants have not consulted with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved with the decision to purchase the property and convert it into an immigration detention facility.

108. Defendants did not collaborate with the City or County prior to purchasing the property or at any point in the process of developing their renovation and operation plans for the facility.

109. To the City's and County's knowledge, Defendants have not prepared an EIS or EA with respect to the Salt Lake Mega Center.

110. Instead, it appears likely that Defendants have invoked the same three categorical exclusions with respect to the Salt Lake Warehouse as they did in Maryland, Michigan, and New Jersey.

111. The categorical exclusions improperly invoked by ICE with respect to the warehouses purchased in Maryland, Michigan, and New Jersey would be similarly inapplicable here.

112.    On information and belief, Defendants' reasoning to support invoking one or multiple categorical exclusions is clearly erroneous.

113.    Defendants' failure to comply with NEPA and the APA is material. Had Defendants complied, they likely would have abandoned or significantly changed the design or operations of the Salt Lake City Mega Center.

114.    The Court should vacate and set aside Defendants' decision to purchase the Salt Lake Warehouse for the purposes of converting it into the Salt Lake Mega Center and enjoin any further implementation of the decision to convert it into a mega detention center, including but not limited to any further activity related to construction or retrofitting of the property.

## COUNT II
### Violation of the Administrative Procedure Act
### Action that is Contrary to Law and/or Arbitrary and Capricious
### (ICA, 31 U.S.C. § 6506(c))

115.    The City and County reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

116.    Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

117.    The ICA requires "State[] and local viewpoints . . . be considered in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c). The ICA imposes "an affirmative obligation" on federal agencies, like DHS and ICE, to consider local interests and "to develop a reviewable record" to explain any "decision to act in

30

disharmony with local planning objectives." *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 976 (2d Cir. 1976).

118.    DHS purchased the Salt Lake Warehouse for the purposes of converting it into a mega detention center in violation of these statutory obligations without considering State and local viewpoints during its deliberative process.

119.    This decision constitutes a final agency action reviewable under the APA.

120.    Defendants' failure to engage in the ICA's required consultation resulted in its deciding to purchase the Salt Lake Warehouse for the purpose of converting it into a mega detention center without critical information from the government officials most knowledgeable about conditions on the ground in the City and County.

121.    City and County officials have intimate knowledge of water, sewage, traffic, air quality, and public health and safety concerns. Without this information, Defendants were unable to make a fully informed and "reasoned choice[]" among competing national, state, and local objectives for development in the City. 31 U.S.C. § 6506(b). This frustrates the central purpose of the ICA.

122.    In addition to being unlawful, Defendants' failure to engage in the kind of government-to-government consultation contemplated by the ICA is arbitrary and capricious.

123.    Under the APA, courts are required to "hold unlawful and set aside" agency actions that are "arbitrary . . . [and] capricious." 5 U.S.C. § 706(2).

124.    Defendants have offered no reasoning to support why consultation was not possible.

125.    Instead, Defendants plainly neglected their duties under the ICA. This neglect is arbitrary and capricious.

126.    Defendants' failure to comply with the ICA and APA is material. Had Defendants complied, they likely would have abandoned or significantly changed the design or operations of the Salt Lake City Mega Center.

127.    The Court should vacate and set aside the Defendants' decision to purchase the Salt Lake Warehouse for the purpose of converting it into a mega detention facility and enjoin any further implementation thereof, including but not limited to any further activity related to construction or retrofitting of the property.

## PRAYER FOR RELIEF

WHEREFORE, the City and County prays that this Court:

i.    Declare that Defendants' decision to purchase and establish an immigration detention facility at the Salt Lake Warehouse without first preparing an environmental assessment or environmental impact statement, or properly invoking a categorical exclusion, is arbitrary and capricious, not in accordance with the law, in excess of statutory authority and right, and without observance of procedure required by law, and therefore in violation of the APA;

ii.    Declare that the Defendant's decision to purchase and establish an immigration detention facility at the Salt Lake Warehouse without taking due consideration of State and local viewpoints is arbitrary and capricious, not in accordance with the law, in excess of statutory authority and right, and without observance of procedure required by law, and therefore in violation of the APA;

iii. Declare that the Defendant's decision to purchase and establish an immigration detention facility at the Salt Lake Warehouse without engaging in reasoned analysis or explaining why it was diverting from policy was arbitrary and capricious and therefore in violation of the APA;

iv. Vacate and set aside Defendants' decision to purchase the Salt Lake Warehouse for the purpose of converting it into an immigration detention facility;

v. Temporarily restrain, preliminarily enjoin, and stay Defendants from further implementing their decision to convert the Salt Lake Warehouse to the Salt Lake Mega Center;

vi. Award reasonable attorney's fees, costs, and expenses incurred in this action;

vii. Grant such other relief as this Court may deem proper.

DATED this 8th day of June, 2026.

**DORSEY & WHITNEY LLP**

**SALT LAKE COUNTY DISTRICT ATTORNEY**

By:/s/ *Jensen Lillquist*
Jensen Lillquist

By: /s/ *Perrin Love*
Perrin R. Love

**SALT LAKE CITY CORPORATION**

*Attorney for Salt Lake County*

By: /s/ *Mark E. Kittrell*
Mark E. Kittrell

*Attorneys for Salt Lake City Corporation*